Good morning, Your Honor. May it please the court, counsel. My name is Jack Peacock, and along with my partner, Mr. David Vareekie, we represent Mr. and Mrs. Searcy, who are This is a fairly complex situation, and it deals with some new regulations. I thought probably the best way to approach this would be to just cut through the chase and go right to 12 CFR 1024.41, because the main issue as I see it is a RESPA issue, which is a right of appeal for a loan modification. In other words, under the regulations of the CFPB, if a loan modification application is denied, then the homeowner is entitled to appeal that. That became effective January 10, 2014. Is there any evidence in the record that the Searcy family sent a completed application to CMI after January 10, 2014, as opposed to the North Texas Housing Coalition, or is it your position that sending it to the North Texas Housing Coalition is the same thing as sending it to CMI? Well, I don't believe it's the same thing. Now, the evidence in the record is four letters from CMI. The January 9, 2014 letter, I'll give you the record page numbers for each of these. January 9, 2014, CMI invited Mr. and Mrs. Searcy to do a loan modification of some type. Then January 28, 2014, CMI sends a letter to the Searcy family on page 1016 of the record. In that letter, CMI confirms that they received the documents for the application for a loan modification and that if anything is missing, we will advise you. So, presumably, nothing was missing because they were never advised that anything was missing until a March 3 letter, but we're not there yet. Now, why is that important? Well, because the regulations, and I'll refer you again to the section numbers. When is an application considered complete? Because you see this language in there, complete application. Well, it's presumed to be facially complete unless the lender notifies you that documents are missing. And if you look at the letters, January 28, 2014, which is page 1016, it doesn't say that anything's missing. So, is it your January, is the answer to my letter is some evidence that a complete application to CMI was submitted after January 10th? Correct. That's your, that's the answer to my question? Yes. Is there any other piece of evidence that supports, I mean, I know that I have a whole list of all the letters, but if I were trying to find out if there's some evidence to support this argument, where, is there anything else that you would point us to? Well, several things. Number one is the January 28th letter, and I think that is the most significant document. But again, February 24th, 2014, which is on page 1019 of the record, also says the same thing. Identical letter? It's identical, yes. So, those two letters are what you rely on? Yes. But the January 28th letter is the key letter. Well, what's confusing is that I thought there was some argument that on February 25th is when they submitted the complete application. Well, then that would be inconsistent with your argument that they had already submitted a document on February 24th. The, there's no question that additional documents were submitted in January 24th or 25th, but the regulation. You mean February? Yeah, I, did I, what did I say? You said January. I'm sorry, February. But the regulation assumes that the lender will want more documentation as they go. But it doesn't mean that the initial application was not considered facially complete in January the 28th of 2014 because of, you know, and I forgot to give you the section numbers that define facially complete. If you go to 12 B2IB, that's capital B, and C2IV, those explain the fact that if a lender does not say in their letter of January 28th that we need additional documentation, then it's presumed that it's facially complete. Counsel, I, I don't see in the record, though, when they submitted this, if you say that on January 28th and February 24th they, the city mortgage acknowledged they had received a complete application, I don't see any evidence that says they submitted an application except back in 2013 July, and that's not a relevant time period. So it seems like there's a gap. Well, the, we don't have those documents, and, but all we have is that the fact that of the letter from CMI that says we got the documents. But there's no testimony that they submitted one after January 10th? I mean, there's no affidavit or something that would tell us that they submitted something timely? Because even if you didn't have a copy of the documents or a copy of the transmittal letter, where did they even allege that they submitted one after January 10th? Well, we don't have anything other than the letter itself. That's all there is. The letter from CMI. Even if we give you that they submitted an application in January after the effective date of the law, how is that more than 90 days before the foreclosure, which happened in March? Okay. Right. That is, it's not. I mean, the 90-day thing is out, but I don't need it. We can just ignore the 90-day requirement? I don't need it, Your Honor. If you look at, and this is where I was going to go, I'd like to address exactly what the regulation says. First of all, 12 CFR 1024.41. Now, if you don't have it in front of you, I have the page number in the record. It's on page 13 of our brief. It's also on page 953 of the record. Now, I agree that reading this is like reading the Internal Revenue Code, but all right. The section says appeal process required for loan modification. Which subsection are you in? I've got it right here. I'm sorry, H1. If a servicer receives a complete loss mitigation application 90 days or more before a foreclosure sale or during the period set forth in paragraph F, the servicer shall permit a borrower to appeal. Is that what you're talking about? I am, Your Honor. It's the part after or, after the word or. That's what's significant for us. That's what gets us where we need to get. Well, show me how you get in under F. All right. All right. Here we go. All right. After or, it says, during the period set forth in paragraph F of this section, a servicer shall permit a borrower to appeal, etc. I get that, but tell me how you meet the period set forth in F. All right. All right. So, F, and it's not, unfortunately, it's, I looked, it's not in the briefs, but I'll read, it's one sentence, the part I want to refer to. And the subsection is F2 of 12 CFR 1024.41. And it says, application received before foreclosure referral. And then it says, if a borrower submits a complete loss mitigation application during the preforeclosure review period set forth in paragraph F1 of this section, or, now here we go, or before a servicer has made the first notice or filing required by applicable law for any judicial or nonjudicial foreclosure process, a servicer shall not make the first notice or filing required by applicable law for any judicial or nonjudicial foreclosure process unless, and then it lists some things that are not applicable. Does your argument require us to treat this provision as retroactive? No. Because it wasn't effective until January 10, unless I'm misunderstanding your point. Oh, no. I believe this case turns on the evidence that CMI had a loan mod application on or before January 28, 2014. Because if they did, and according to them, on or before means it could have been before, right? There's an unfortunate gap in the facts. And I understand it. There are people who make an application and don't keep it for themselves. I understand that. The unfortunate thing is we are now left with a quandary of not knowing whether you filed this application and whether it was complete either before or after the regulation took effect. So my question is, are you essentially counting on a retroactive application of the regulation? No, I'm not. I don't. I think the case law says that it's not retroactive. So as far as the July application, I think that's out. I don't think But so you concede you have to have a completed application after the effective date. That's right. I agree. How can you prove that you had a completed application after that date? Or is it ambiguous? Well, all I've got is the circumstantial evidence and the inference because we got a letter January the 9th inviting a loan mod. And then in January 28th, we get a letter from CMI saying thank you for the documents. We'll And I think that I wish I had more, but that's what I have. And I think it's enough to get us there under the regulations if CMI's letter is to be believed. So I think that gets us there. Now, I know you want to talk about your other claim, but when you come back on rebuttal, can you tell us if you told us that it was the F provision that applies in your briefing because or if you told even the district court because I don't see that the district court went through that analysis and says you either meet that or didn't. I just Well, the 90 days and moves along and says that the court does say that November 29th, 2012, it was more. So maybe that's understood, but I don't see you making this F argument in the brief. Well, the reference to F is in the we cited the the appeal process. In other words, we were hanging our hat on the fact that we were entitled to an appeal and we didn't get it and even CMI in their March 3rd, 2014 letter agrees. Oh gosh, I ran out of time. Yes, counsel. I'm sorry. Why don't you take two minutes and talk about your debt collection claim? We can fully open. Sure. Regarding the debt collection claim, we feel like that it's either we either have a good claim under RESPA or if we don't, but I frankly think that we do. But even if we don't, we have a debt collection claim because the the March or the letters that they sent and the March 3rd letter all say this is an attempt to collect a debt. Now, I agree. Was it an attempt to collect the debt? Sure. The whole purpose for loan modification is they can get their money so they can collect. That's the whole purpose. The purpose of loan modification is to modify the terms of the debt, which is different from saying the debt is due, pay up, pay this amount, pay by a certain date. I fully agree with that. But the ultimate goal is to collect the money and that's what they're trying to do. That's the whole purpose for the loan modification so they can get their money. And that's been our I realize I understand. I know that the Thompson case. I know the Clark case. The court has has your theory. Anything sent from a lender is going to be it's always the ultimate purpose. Sending the application to fill out to get a loan is the ultimate goal is to get money down the road. So it is broad. Sure. A marketing brochure about loan financing could be a debt collection. Sure. But but they say it in their letters. But this says the purpose is debt collection on its face on its face. That's why isn't that at least a fact issue? Well, I think it is. And not only that, the the the if if I if I make a statement to this court, I have to I have to I'm accountable for that. Whatever I say, they ought to be accountable. Magic words in reverse. All right. Pardon me, Your Honor. Magic words in reverse. The fact that the magic words were uttered when, in fact, they shouldn't have been uttered. Well, I mean, they can argue that and they always do. But the fact of the matter is, they say the purpose of this letter is debt collection. And it either is or it isn't. And like Your Honor said, it's certainly a fact question, at least. Thank you. Oh, thank you, Your Honor. Thank you. You may proceed, counsel. Thank you, Your Honors. My name is Michael McElroy and I represent City Mortgage. And we're asking the court to affirm the judgment of the trial court. Can we start there, please? It seems that there are arguably three misrepresentations in the March 3rd letter. OK. We admit that the March 3rd letter was sent in error. We admit it's wrong. It has errors in it. That's correct. It never should have been sent because there was no loss mitigation application that it responded to. It was sent in error. It says that the request had been denied because of inan—that was an error. That's correct. It says that they have 30 days to appeal and that no foreclosure would take place during the foreclosure. And that was an error. That's correct. And then it says—and which is a big error that affected, arguably affected, the plaintiffs, right? I mean— Well, I don't think it did. But it—the foreclosure took place. I think there are circumstances in which it could affect a borrower. I don't think it affected these borrowers. And it—they said they could still qualify for loan modification, which was arguably an error also at that point. I don't know if that was an error. We don't know if that—if those other two are definite errors. Yeah, if there hadn't been a foreclosure, it's possible they could have still qualified for a loan modification. Why was the district court not incorrect in granting summary judgment on a claim where it says on its face that it's to collect a debt and there are noted errors in the letter? Well, I think for two reasons. One, I think the district court correctly elevated substance over form. And just because it says it's an attempt to collect a debt doesn't mean that it is an attempt to collect a debt. And it applied an animating purpose test, which I think is a correct test. I think it's a fair test that you have to look at the substance of the letter and determine what the animating purpose of the letter is. Is the animating purpose of the letter to collect a debt? I think the answer to that question is no with respect to that March 3rd letter. There's nothing in it that says you owe this amount, you have to pay it by this date. If you don't pay it, here's the consequences. The animating purpose of the letter was to inform them of their rights. I'll be incorrect, inform them of their rights had they submitted a loss of an application and it was denied for the reasons stated in that. Is that an appropriate analysis in light of our past case law that talks about these reasonable consumer in this situation is not necessarily sophisticated and relies upon these notices, which this is a direct, it's a notice that would normally be required to be given that was attached in the back. And that's why they have these boilerplate notices. I do, actually, because I think what we're talking about here is whether it fits within the statute or not. Whether this is a letter that qualifies as a debt collection letter, which I don't think really applies to what they would perceive once they received the letter. I think that's sort of irrelevant. I think the question is that the court was trying to answer is, is this a letter that comes within the ambit of the statute itself? What is the, you said you had a second reason? They didn't have any damages, no damages. I think that's the big one, as a matter of fact. I think that the evidence of damages is, there's zero evidence of damages. And there's zero evidence that they were, they suffered any damages as a result of that letter itself. If you look at their arguments, they say that they suffered four categories of damages. One, they lost title to the house. Two, they claim damages from attorney's fees spent in a forcible detainer action. Three, they say attorney's fees spent in this litigation. And four, mental anguish damages for Faye Searcy. Not for Bobby Searcy, but for Faye Searcy. If you look at each one of those and look at the evidence, to the extent that they're even recoverable at all, which the attorney's fees obviously are not, there's no evidence that those are actual compensable damages. And there's nothing that ties those damages to that March 3rd letter. Take the title to the house, for instance. They lost title to the house because they were in default. And City Mortgage, as the mortgagee, had a contractual right to foreclose and sell the property. That's why they lost title to the property, and that's undisputed. There's nothing that would have saved this property from foreclosure, even if they had seen that March 3rd letter. They saw the March 3rd letter on March 5th, the day after the foreclosure sale occurred. And that's undisputed. They tried to present evidence in a summary. But the foreclosure that caused the mental anguish, not the letter. If they suffered mental anguish, which I don't think that they did, but if they did. What is some evidence that they did? I think that the evidence that they present, you know, we cite a number of cases in our briefing that says that's insufficient as a matter of law. Well, we let some, in McCaig, the evidence is kind of similar, isn't it? And we upheld that. But if you look at this evidence, the only thing that they say is we suffered mental anguish is essentially it. Which is insufficient as a matter of law, according to the Texas Supreme Court. I mean, that's really it. They say nothing about the nature of the mental anguish. When I asked her direct questions, what are your symptoms? She couldn't recall. I asked her about the duration, which is another element. How long did it last? She couldn't recall. So, do you think that's the cleanest way to deal with this claim? Is to say that, assuming arguendo, that this is a debt collection letter because it says on its face that there's no damages alleged, is that what you would want us to do? I certainly think you can dispose of the TDCA claims without having to reach the issue of whether or not the Marks III letter is a debt collection letter. The answer is yes. I think the no damages is dispositive of all the TDCA claims. And like I said, not just no damages, but no causation. I mean, the Texas law says you have to link the damages to the alleged violation. And there's absolutely no evidence that links any of those alleged damages to that Marks III letter. And when I asked her those questions about mental anguish, I was actually focusing directly on that Marks III letter. I was asking her specifically about it. And she couldn't answer any of my questions. And Mr. Searcy never even saw the letter. And so, we don't need to get into the complicated issue of whether or not, even if it is a loan modification, could it simultaneously be debt collection, which has been left open after Thompson and Singa? Well, actually, you know, as I understand those cases, what they've left open the door, as I understand, and I could be wrong, is they've left open the door to the other part of the 392-304 claims, which are in debt collection or obtaining information concerning a consumer. And as I understand it, they've left open the door that some of these letters could be actionable if they're sent with the intent to obtain information concerning the consumer. That's how I understand it. But I agree with you that if you don't want to address any of those issues, you have a clear path. And that clear path is there's no damages and no causation of damages as a result of any alleged violation of the TDCA. Thank you. Now, with respect to the CFPB regulation claim, I wanted to address the F issue, subsection F, which was never addressed in any of the briefing. And it's being addressed for the first time here. And he cited for you the passage in F that says that I think it has to be before a servicer has made a first notice or filing required by applicable law for any judicial or nonjudicial foreclosure process. Well, Texas law, the nonjudicial process, is governed by section 51.002 of the Texas Property Code. And the first notice that's required under section 51.002 is under D, subsection D, which requires a notice of default and opportunity to cure. That's the first notice required under Texas law. And on December 3, 2012, the evidence shows that City Mortgage sent a notice of default and opportunity to cure letter. And that's in the record at 9, I'm sorry, 797 through 798. So I think that answers that question. I think the court was correct that they met neither of the timeframes, the 90 days before the foreclosure sale or the 120 days delinquent. With respect to, and I think you've correctly focused on the January 28th letter because the February 25th law submit application, Faye Searcy admits she sent that to an entity that she was working with, not City Mortgage. She was working with this entity called the North Texas Housing Coalition. She sent that application to them. She admits that City Mortgage never saw it. I think to quote her, she said, they didn't know about it. And the July 31st, 2013 application was submitted, approved, rejected by them, closed out, and referred to foreclosure counsel all before the effective date. So if we're left with anything, it's this January 28th letter. But that's all we have. There's no corroborating evidence. In fact, to be frank, I don't think they sent anything. I asked her in her deposition, did you send anything to City Mortgage after August 22nd, 2013, which was the date that we had sent her the trial period plan? And she said, I don't think so. That's in her deposition testimony. I think what they've done is they've got this letter dated January 28th, 2014, and they've crafted a story to say, aha, look, here's a fact issue. This keeps the door open. This gives us something. And so if you look at what the letter itself says, it says, we acknowledge your request for loss mitigation assistance. In her affidavit, Fay Searcy says, so I submitted the request for loss mitigation assistance. As you correctly noted, no one says when it was submitted. There's no evidence it was submitted after January 10th, 2014, and there's no evidence of what was submitted. They certainly could have explained what they submitted, but all they say is they submitted a request for loss mitigation assistance. All the letter says is, thank you for sending us a request for loss mitigation assistance. The very bottom of the letter explains that once you've provided us with a complete loss mitigation application, we will review it and all foreclosure activity will stop. The affidavit from City Mortgage corroborates what Fay Searcy said in her deposition, that they never sent anything after the July 31st, 2013 loss mitigation application. So there's no evidence in the record that if anything was sent, it was a complete loss mitigation application that would have triggered any obligation under subsection H1 of the loss mitigation procedures. And unless there's any other questions, I'll yield the rest of my time and just rely on the briefing that has been done. Thank you, Counselor, for your argument. Thank you. Counsel, you've saved time for rebuttal. Good morning, David Vericki here for Mr. and Mrs. Searcy, and I'm going to do the rebuttal. I'd like to address first on the damages issue. There is testimony, this is on the record on page 924, from Mr. Searcy, where he talks about what he's gone through as a result of having to fight for his home. This starts on line 7. Naturally, the foreclosure is a tough situation. What ties it to this particular letter that's the alleged false debt collection? As far as his testifying about damages? Right. What damages flow directly from this one letter that you claim has the misrepresentations? That's all the debt collection is about. That's not about the foreclosure, which naturally is going to have adverse consequences. Well, he talks about how it affected his blood pressure. This letter? Where in the record does it tie it to this letter? I'm talking about the foreclosure itself, Your Honor. How does that help you? I don't doubt foreclosure causes people, but it's a tough situation to be in. Right. How does that help you on a claim that's based on one letter that allegedly has false representations in connection with debt collection? Well, I think that's not the only one. I think those three letters are either they either modify the period for appeal or they're false, misleading, and misrepresentations. Right. And what evidence says those false statements, as opposed to the foreclosure itself, caused mental anguish or any other damages? Well, it's the foreclosure itself. I mean, the letter brought about the foreclosure. And the letter is the representation. We're people that things represent something else. You know, that flag represents the United States. That letter represented a foreclosure. It was the fact that it was talking about a foreclosure, not the false statements. But anyway, are your clients still in the House? Yes, they are. So they've been going on five-plus years without having to pay any of the mortgage, with the defendant paying their taxes and insurance. So even if there are some conceivable damages out there, wouldn't they be vastly offset by the money your client owes for that free housing they've had? Possibly, but not necessarily. They've had to pay us all during this period that we have represented them. The mortgage company, of course, once they decide to foreclose, they won't accept payments. So they couldn't pay if they wanted to. And they do want to. They want to keep their home. So we're here fighting for the home. That's a pretty good deal. I mean, most people out there would be thrilled to have a nice house free for five years, wouldn't they? Well, it's not really free because they're paying the payment into our trust account. So they're living there based on a payment into our trust account, and that keeps the – Who's paying the taxes and insurance over the last five or six years? The owner of the property. But they chose that. They chose that. And here, the way we handle these, if we can get the mortgage – if we could get this turned around, we will take the arrearage, Your Honor, and put it on top of the loan so it's not due until time of sale so that the payments can be affordable. So the mortgage company can't act this way and get somebody's home. That's what this case is really about. It's not about living there for free. It's about what the mortgage company did. And this is the sloppiest foreclosure I've ever seen with these letters ahead of time. And you look at what's evidence of these – of them not having a full packet. If you look at that January 28th letter, they say – and Mr. Peacock pointed this out – if any of the documents are incomplete or we need additional documents, we will send you a detailed letter specifying what is missing. All right, that was January 28th. Here, the next letter is almost a month later when they've had plenty of time to look at the documents, and they say basically the same thing. This was their golden opportunity to tell Mr. and Mrs. Searcy, we don't have this document, that document, a detailed explanation of what documents we need. They had a month to look at the documents and tell the Searcy's. This is evidence that they had the documents as far as us looking at it. This is a summary judgment case, Your Honor, and we're saying there are fact issues here that a jury could determine. And under Anderson v. Liberty Lobby, the idea of balancing and weighing credibility and all is up to a jury, not the trial judge. So we're asking that it be remanded and that – reversed and remanded, sent back to the trial court for a jury trial. Thank you, we have your argument. Pardon? I said thank you, we have your argument. Oh, okay, thank you. These echoes in here kind of – I apologize, I didn't speak up. Thank you, Your Honor. This concludes the arguments for this session of the court. The court will stand adjourned pursuant to the usual order. Thank you.